UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| DANE ZEEN,<br><br>    Plaintiff,<br><br>v.<br><br>COUNTY OF SONOMA, et al.,<br><br>    Defendants. | Case No. 17-cv-02056-LB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF No. 51 |

**INTRODUCTION**

In the early hours of December 15, 2015, Sonoma County Sheriff Deputies Michael Yoder and Charles Blount arrived at the home of Dane Zeen. Earlier that night, Mr. Zeen — an eighteen-year-old who had suffered for many years from depressive disorder — had texted a friend that he was thinking of hanging himself. The friend called 911, and the Sonoma County Sheriff's Office dispatched Deputies Yoder and Blount to Mr. Zeen's home to conduct a welfare check. Deputy Yoder arrived first and spoke with Mr. Zeen's stepfather, Tim LaRose, who told him that Mr. Zeen was out in his truck. Deputy Yoder went out to speak with Mr. Zeen, asked him to step out of the truck and handcuffed him for officer safety, spoke more with Mr. LaRose (after Deputy Blount arrived and stayed with Mr. Zeen), and determined that Mr. Zeen should be put on a 72-hour mental-health hold pursuant to California Welfare & Institutions Code § 5150.

Those facts are not in dispute. What is in dispute is what happened next. After Deputy Yoder told Mr. Zeen that he was placing him on a Section 5150 hold, Mr. Zeen dug in his heels (literally) and refused to move and go with the deputies. Deputy Yoder held onto Mr. Zeen's arm and tried to get him to walk. The defendants say that Mr. Zeen tried to pull away from Deputy Yoder, causing Deputy Yoder to lose his balance and start falling down, which in turn caused Mr. Zeen to fall down to the ground as well. Mr. Zeen and Mr. LaRose say that Deputy Yoder pulled or threw Mr. Zeen to the ground face-first while he was handcuffed. It is undisputed that as a result of the fall, Mr. Zeen bled heavily and broke three teeth, which were jammed into their sockets under his nose.

Mr. Zeen brought claims against (1) Deputies Yoder and Blount under 42 U.S.C. § 1983 for excessive force, (2) Sonoma County Sheriff Steve Freitas under 42 U.S.C. § 1983 for supervisory liability, and (3) the County of Sonoma and Sheriff Freitas for municipality liability under the doctrine of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). The defendants moved for summary judgment. Mr. Zeen does not oppose the defendants' motion with respect to Deputy Blount,[1] so the court will grant Deputy Blount summary judgment. Mr. Zeen opposes the defendants' motion with respect to Deputy Yoder, Sheriff Freitas, and the County. For the following reasons, the court denies summary judgment as to Deputy Yoder and grants summary judgment as to Sheriff Freitas and the County.

## STATEMENT

**1. The Events Before Deputy Yoder Placed Mr. Zeen on a Section 5150 Hold**

Mr. Zeen states that "[f]or the purposes of [the defendants' summary-judgment] motion, [he] does not dispute the defendants' recitation of the facts preceding the point at which he was placed on a 72-hour hold."[2] Those facts are as follows:

---

[1] Pl. Opp'n – ECF No. 60 at 5 n.1. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 6 (emphasis removed).

In the early morning hours of December 15, Michael Yoder, then a deputy sheriff with the Sonoma County Sheriff's Office (now retired), received a call from dispatch asking him to respond to a welfare check on a suicidal subject.[3] The subject — Dane Zeen — had reported to a friend that he wanted to hang himself.[4] The friend called 911.[5]

Deputy Yoder responded to a rural home on McFarland Drive in Sebastopol, Sonoma County, California.[6] There was a long dirt driveway approaching the gated property, which was pitch dark when Deputy Yoder arrived.[7] Deputy Yoder approached the home and knocked on a door, and Tim LaRose — Mr. Zeen's stepfather — eventually answered.[8] Mr. LaRose confirmed that Mr. Zeen had fought with his mother, was suicidal and had mentioned wanting to hang himself, and was told to go sleep in his truck.[9] Deputy Yoder went out to the truck and knocked on the rolled-up window, through which he could see Mr. Zeen.[10]

Mr. Zeen told Deputy Yoder that he was "fucked up inside."[11] Mr. Zeen told Deputy Yoder that he "did not know anymore" what kind of help he needed and said that his parents would not help him.[12] Deputy Yoder asked Mr. Zeen to exit the vehicle so he could search him for weapons,

---

[3] Defs. Mot. – ECF No. 51 at 6 (citing Yoder Dep. pp. 23–25 – ECF No. 52-1 at 9–11); *see also* Police Incident Report – ECF No. 52-1 at 2.

[4] Defs. Mot. – ECF No. 51 at 6 (citing Yoder Dep. pp. 23–25 – ECF No. 52-1 at 9–11); *see also* Police Incident Report – ECF No. 52-1 at 2.

[5] Defs. Mot. – ECF No. 51 at 6 (citing Yoder Dep. pp. 23–25 – ECF No. 52-1 at 9–11); *see also* Police Incident Report – ECF No. 52-1 at 2.

[6] Defs. Mot. – ECF No. 51 at 6–7; *see also* Police Incident Report – ECF No. 52-1 at 2.

[7] Defs. Mot. – ECF No. 51 at 7 (citing Yoder Dep. pp. 25–26 – ECF No. 52-1 at 11–13).

[8] *Id.* (citing Yoder Dep. pp. 26–27 – ECF No. 52-1 at 13–15; LaRose Dep. p. 46 – ECF No. 52-2 at 7); *see also* Police Incident Report – ECF No. 52-1 at 2.

[9] Defs. Mot. – ECF No. 51 at 7 (citing Yoder Dep. p. 27 – ECF No. 52-1 at 15; LaRose Dep. pp. 51–53 – ECF No. 52-2 at 8–10); *see also* Police Incident Report – ECF No. 52-1 at 2.

[10] Defs. Mot. – ECF No. 51 at 7 (citing Yoder Dep. pp. 27–29 – ECF No. 52-1 at 15–19); *see also* Police Incident Report – ECF No. 52-1 at 2.

[11] Defs. Mot. – ECF No. 51 at 7; *see also* Police Incident Report – ECF No. 52-1 at 2; Yoder Dep. p. 52 – ECF No. 52-1 at 28; Zeen Dep. p. 73 – ECF No. 52-2 at 29.

[12] Defs. Mot. – ECF No. 51 at 7 (citing Police Incident Report – ECF No. 52-1 at 2); *see also* Yoder Dep. p. 52 – ECF No. 52-1 at 28.

and Mr. Zeen complied.[13] Once Mr. Zeen was out of his vehicle, Deputy Yoder handcuffed Mr. Zeen behind his back.[14] Deputy Yoder continued his interview of Mr. Zeen and Mr. LaRose to determine if Mr. Zeen posed a danger to himself.[15] Mr. Zeen was quiet and cooperative.[16] As Deputy Yoder took Mr. LaRose aside to interview him, Deputy Charles Blount arrived at the location as the backup deputy and stood next to Mr. Zeen while Deputy Yoder interviewed Mr. LaRose.[17] Mr. Zeen was placid and quiet during the entire period he was standing outside his truck.[18]

Mr. LaRose told Deputy Yoder that he was planning on taking Mr. Zeen to Psychiatric Emergency Services and that he had taken Mr. Zeen there in the past.[19] After speaking with Mr. LaRose, Deputy Yoder determined that Mr. Zeen should be placed on a Welfare & Institutions Code Section 5150 involuntary hold.[20] Deputy Yoder returned to where Mr. Zeen was standing and told him that he placing him on a 72-hour hold.[21]

---

[13] Defs. Mot. – ECF No. 51 at 7 (citing Police Incident Report – ECF No. 52-1 at 2); *see also* Yoder Dep. pp. 52–53 – ECF No. 52-1 at 28–29.

[14] Police Incident Report – ECF No. 52-1 at 2; Yoder Dep. pp. 53–54 – ECF No. 52-1 at 29–30.

[15] Defs. Mot. – ECF No. 51 at 7; *see also* Police Incident Report – ECF No. 52-1 at 2; Yoder Dep. pp. 53–54, 58 – ECF No. 52-1 at 29–30, 33.

[16] Defs. Mot. – ECF No. 51 at 7 (citing Yoder Dep. pp. 52–53 – ECF No. 52-1 at 28–29); *see also* Yoder Dep. p. 58 – ECF No. 52-1 at 33.

[17] Defs. Mot. – ECF No. 51 (citing Blount Dep. pp. 32–34 – ECF No. 52-1 at 66–68; Yoder Dep. pp. 51–54 – ECF No. 52-1 at 26–30); *see also* Police Incident Report – ECF No. 52-1 at 2; Yoder Dep. pp. 58–59 – ECF No. 52-1 at 33–35.

[18] Defs. Mot. – ECF No. 51 (citing Schott Decl. Ex. C (on file with court); Blount Dep. p. 35 – ECF No. 52-1 at 69); *see also* Yoder Dep. p. 59 – ECF No. 53-1 at 35.

[19] Defs. Mot. – ECF No. 51; *see also* Police Incident Report – ECF No. 52-1 at 2; LaRose Dep. pp. 51–53 – ECF No. 52-2 at 8–10.

[20] Defs. Mot. – ECF No. 51 (citing Yoder Dep. pp. 58–59 – ECF No. 33–35); *see also* Police Incident Report – ECF No. 52-1 at 2.

[21] Defs. Mot. – ECF No. 51 at 8 (citing Yoder Dep. pp. 57–62 – ECF No. 52-1 at 32–41); *see also* Police Incident Report – ECF No. 52-1 at 2.

## 2. The Events After Deputy Yoder Placed Mr. Zeen on a Section 5150 Hold

Deputy Yoder (and possibly Deputy Blount) placed his hand in the crook of Mr. Zeen's elbow.[22] Mr. Zeen began shouting and (literally) dug in his heels, refusing to go with the deputies.[23] The deputies and Mr. Zeen had the following exchange:

> Deputy Yoder: I'm putting you on a 72-hour hold.
>
> Mr. Zeen: No.
>
> Deputy Yoder: ... It's not your choice.
>
> Mr. Zeen: This is bullshit.
>
> Deputy Yoder: Mmkay. Watch out.
>
> Mr. Zeen: No.
>
> Deputy Yoder: Yeah.
>
> Mr. Zeen: What the fuck? No!
>
> Deputy Yoder: It's not an option.
>
> Mr. Zeen: No! What the fuck?
>
> Deputy Yoder: Look. Just, just —
>
> Mr. Zeen: No. I don't want to fucking go anywhere.
>
> Deputy Yoder: You don't need to get hurt too, okay?
>
> Mr. Zeen: [Dude, I have, I have so much more] shit I need to do, I can't, I don't have time for this! I have to do shit tomorrow, man! Fuck! Dad! No! No! Hey! No! I won't fucking go![24]

---

[22] Yoder Dep. pp. 60, 64–65 – ECF No. 52-1 at 37, 45–47; LaRose Dep. pp. 58, 62-63 – ECF No. 52-2 at 13, 17–18; Zeen Dep. p. 81 – ECF No. 52-2 at 37.

[23] Police Incident Report – ECF No. 52-1 at 2; Yoder Dep. p. 61 – ECF No. 52-1 at 39; LaRose Dep. pp. 61–62 – ECF No. 52-2 at 16–17; Zeen Dep. pp. 30–31 – ECF No. 52-2 at 30–31.

[24] Schott Decl. Ex. C (on file with court); Schwaiger Decl. Ex. 5 (transcription of body camera footage) – ECF No. 60-1 at 48.

As described below, both Deputy Yoder and Deputy Blount were wearing body cameras that recorded footage of the incident, which the defendants have submitted as an exhibit to their summary-judgment motion. Schott Decl. Ex. C (on file with court). Mr. Zeen's counsel made an informal written transcript of a portion of the body camera footage. *See* Schwaiger Decl. – ECF No. 60-1 at 2 (¶ 6). The defendants have not disputed the accuracy of the transcript in their reply. *See* Defs. Reply – ECF No. 62. The court quotes Mr. Zeen's counsel's transcript here solely as a convenience. The court does not mean to suggest that this transcript has no errors (e.g., misidentifying a speaker or omitting words

*(cont'd)*

According to the defendants, Mr. Zeen dropped his weight, and Deputy Yoder had to pull him up to regain his footing.[25] Mr. Zeen then shifted his weight and used his heels to push back to try to get out of Deputy Yoder's arm hold, and Deputy Yoder lost his balance and fell to the ground.[26] Deputy Yoder's falling while holding onto Mr. Zeen's arm, coupled with Mr. Zeen's active resistance, caused Mr. Zeen to fall as well.[27]

According to Mr. Zeen, Deputy Yoder pulled or threw him to the ground face-first while he was handcuffed. Mr. Zeen testified, "They started taking me away at the same time, and then he pulls me to the ground face first, and that's all I remember."[28] Mr. LaRose testified, "I see the officer on the inside, farthest away from me, and it basically looked like he still had his arm wrapped around Dane's, twisted and — what appeared to be — throw Dane on the ground. While that's all happening, he pulled Dane out of the arm of the other officer."[29]

After Mr. Zeen hit the ground, the parties had the following exchange:

Deputy Yoder: Do not fight me!

Mr. Zeen: [Moaning.]

Mr. LaRose: Dane, look at what you just did to yourself.

Mr. Zeen: [Moaning.]

---

where two people were speaking on top of each other) or that it is controlling over the videos. The court has watched the underlying videos in evaluating the defendants' motion, and any errors that the transcript may contain do not affect the court's decision on the motion.

[25] Defs. Mot. – ECF No. 51 at 8; *see also* Yoder Dep. p. 62 – ECF No. 52-1 at 41.

[26] Defs. Mot. – ECF No. 51 at 8 (citing Yoder Dep. pp. 61–66 – ECF No. 52-1 at 39–48; Blount Dep. pp. 43–44 – ECF No. 52-1 at 71–72); *see also* Police Incident Report – ECF No. 52-1 at 2. The defendants' motion also cites page 63, lines 11 to 13, of Mr. LaRose's deposition, but those lines do not establish that Deputy Yoder lost his balance or that he fell. *See* LaRose Dep. p. 63 – ECF No. 52-2 at 18.

[27] Defs. Mot. – ECF No. 51 at 8 (citing Yoder Dep. pp. 63–66 – ECF No. 52-1 at 43–48); *see also* Police Incident Report – ECF No. 52-1 at 2; Zeen Resps. to Reqs. for Admission – ECF No. 52-2 at 52 ("REQUEST FOR ADMISSIONS NO. 3: Admit that you physically resisted DEPUTY YODER on the date of the incident when you realized that he intended to place you on a 5150 hold. RESPONSE TO INTERROGATORY NO. 3: Plaintiff objects that the request is vague and ambiguous. Notwithstanding the foregoing objection, plaintiff admits.").

[28] Zeen Dep. pp. 73–74 – ECF No. 52-2 at 29–30.

[29] LaRose Dep. p. 64 – ECF No. 60-1 at 37.

| | |
|---|---|
| 1 | Mr. LaRose: You didn't have to slam him that hard. |
| 2 | Mr. Zeen: [Moaning.] |
| 3 | Deputy Yoder: He took me down if you didn't notice. |
| 4 | Mr. LaRose: You split his teeth open, for Christ's sake! |
| 5 | Deputy Yoder: Get back. |
| 6 | Mr. Zeen: [Moaning.] |
| 7 | Mr. LaRose: I am back. |
| 8 | Deputy Blount: Back further. |
| 9 | Mr. LaRose: I'm back far enough. I'm out of your — |
| 10 | Deputy Blount: Don't come any closer. |
| 11 | Mr. LaRose: I'm out of your reach. |
| 12 | Deputy Blount: Don't come any closer. |
| 13 | Mr. LaRose: I'm only concerned about my son. |
| 14 | Mr. Zeen: [Moaning.] |
| 15 | Deputy Yoder: Are you gonna walk on your own? |
| 16 | Deputy Blount: I understand that. |
| 17 | Mr. Zeen: [Moaning.] |
| 18 | Mr. LaRose: It's pretty hard to watch two big guys throw down a hundred-pound kid, alright?[30] |

After Mr. Zeen hit the ground, a large amount of blood started coming from his mouth.[31] Deputies Yoder and Blount took Mr. Zeen to a Sutter hospital.[32] Sutter treated Mr. Zeen for his injuries, including having an oral surgeon pull his damaged teeth.[33]

---

[30] Schott Decl. Ex. C (on file with court); Schwaiger Decl. Ex. 5 (transcription of body camera footage) – ECF No. 60-1 at 48–49. By way of comparison, at the time of the incident, Deputy Yoder weighed about 225 pounds. Yoder Dep. p. 56 – ECF No. 60-1 at 20.

[31] Defs. Mot. – ECF No. 51 at 8 (citing Police Incident Report – ECF No. 52-1 at 2); *see also* Yoder Dep. pp. 74–75 – ECF No. 52-1 at 57–58. Mr. Zeen can be seen visibly bleeding in Detective Blount's body camera footage. Schott Decl. Ex. C (on file with court).

[32] Defs. Mot. – ECF No. 51 at 9 (citing Yoder Dep. pp. 77–78 – ECF No. 52-1 at 60–61).

Both Deputy Yoder and Deputy Blount were wearing body cameras that recorded some of this incident. The parties submitted the footage from the body cameras as evidence for the court to consider on this motion.[34] Deputy Yoder's camera stopped recording about the time when Mr. Zeen hit the ground; it may have stopped recording because it was impacted by the fall.[35] Deputy Blount's camera continued recording. The dark conditions, the lack of ambient lighting other than limited lighting from the deputies' flashlights, and the limited visual angles of the cameras make it difficult to see on the videos everything that took place.[36] The parties have submitted competing expert declarations regarding the videos.[37]

## STANDARD OF REVIEW

The court must grant a motion for summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to

---

[33] Zeen Dep. p. 40 – ECF No. 52-2 at 28. Mr. Zeen alleges in his complaint that three of his front teeth were broken and jammed into their sockets under his nose. Compl. – ECF No. 1 at 3 (¶ 14); *see also* Compl. Attachment – ECF No. 1 at 9 (photograph of injuries). The defendants do not characterize or dispute Mr. Zeen's injuries in their summary-judgment filings.

[34] Schott Decl. Ex. C (on file with court); Schwaiger Decl. Ex. 4 (on file with court).

[35] *See* Police Incident Report – ECF No. 52-1 at 2; Yoder Dep. p. 43 – ECF No. 52-1 at 24. There is no evidence to suggest that anyone turned off Deputy Yoder's camera intentionally.

[36] *See* Defs. Mot. – ECF No. 51 at 9 ("The dark conditions at the plaintiff's residence combined with the ambient light sources from Deputy Blount's flashlight and the house lights make the videos difficult to view without forensic assistance."); Schott Decl. Ex. C (on file with court).

[37] The defendants raise several objections to the plaintiff's expert. Defs. Reply – ECF No. 62 at 1–4. Because the court does not rely on the plaintiff's expert in deciding the defendants' summary-judgment motion, it declines to address these objections here.

interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence. Instead, it views the evidence in the light most favorable to the non-moving party and draws all factual inferences in the non-moving party's favor. *E.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

## ANALYSIS

**1. Deputy Yoder**

    **1.1    Governing Law**

        **1.1.1    Excessive force**

"The 'touchstone of the Fourth Amendment is reasonableness.'" *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)). "Determining whether the

force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citations and some internal quotation marks omitted). To do so, a court must evaluate "the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations omitted). The *Graham* factors, however, are not exhaustive. *George v. Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013). "[T]here are no per se rules in the Fourth Amendment excessive force context." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007)). Courts must therefore "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. McPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citations omitted).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)); *see id.* at 396 ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment.") (citations omitted). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

### 1.1.2 Qualified immunity

"'[T]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mattos*, 661 F.3d at 440 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "The purpose of qualified immunity is to strike a balance between the competing 'need to hold public officials accountable when they exercise

power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Id.* (quoting *Pearson*, 555 U.S. at 231). Qualified immunity "is '*an immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (emphasis in original) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Under qualified immunity an officer will be protected from suit when he or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

"[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'" *Id.* at 1866 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." *Id.* at 1867.

In determining whether an officer is entitled to qualified immunity, courts consider (1) whether the officer violated a constitutional right of the plaintiff, and (2) whether that constitutional right was "clearly established in light of the specific content of the case" at the time of the events in question. *Mattos*, 661 F.3d at 440 (citation omitted). Courts may exercise their sound discretion in deciding which of these two prongs should be addressed first. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Regarding the second prong, the Supreme Court has cautioned that "'clearly established law' should not be defined 'at a high level of generality'" but instead "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted). The Supreme Court has held that "[a]lthough [its] case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citing *White*, 137 S. Ct. at 551). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent

'squarely governs' the specific facts at issue." *Id.* at 1153 (citing *Mullenix v. Luna*, 136 S. Ct. 305, 312 (2015)).

### 1.2 Application

Viewing the evidence and drawing all inferences in Mr. Zeen's favor, the relevant facts are these: Deputy Yoder seized Mr. Zeen and cuffed his hands behind his back. Mr. Zeen was not suspected of having committed any crime. He posed no danger to the deputies. He did not resist being handcuffed. He did not try to flee.[38] Despite this, Deputy Yoder pulled or threw Mr. Zeen face-first onto the ground while he was handcuffed, breaking his teeth and causing him to bleed heavily from his mouth. It is beyond debate that taking a handcuffed detainee, who was suspected of no crime, posed no danger, and made no attempt to flee, and pulling or throwing him face-first into the ground and breaking his teeth, constitutes a Fourth Amendment excessive-force violation.

The Ninth Circuit addressed a similar situation in *Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003). *Meredith* involved IRS agents who were executing a search warrant at a three-story building in connection with an investigation into suspected income-tax violations. *Id.* at 1060. A building resident confronted the agents and asked to see a search warrant. *Id.* One of the agents "grabbed [the resident] by her arms, forcibly threw her to the ground and, twisting her arms, placed handcuffs on her wrists." *Id.* The Ninth Circuit held that, because the crimes the agents were investigating were nonviolent, the resident posed no safety risk, and she made no attempt to leave the scene, the IRS agent's actions in grabbing her by her arms, throwing her on the ground, and twisting her arms to handcuff her, constituted excessive force and violated the Fourth Amendment. *Id.* at 1061. The Ninth Circuit further held that it was clearly established that the agent's actions violated the Fourth Amendment and that the agent thus was not entitled to qualified immunity. *Id.*

---

[38] Mr. Zeen testified that he refused to move when Deputy Yoder tried to get him to walk after placing him on the 72-hour hold. The defendants maintain that Mr. Zeen tried to get out of Deputy Yoder's hold and potentially tried to flee, but on a motion for summary judgment, all factual disputes and inferences must be drawn in Mr. Zeen's favor.

If the events in *Meredith* constituted unconstitutional excessive force, the events in this case do too. There was less justification for the use of force here than there: unlike the resident there in *Meredith*, Mr. Zeen was already handcuffed and subject to police control before the police pulled or threw him on the ground. The police also used more force here than there: Mr. Zeen suffered significantly more serious injuries than did the resident in *Meredith*, which (drawing all inferences in Mr. Zeen's favor) suggests that the police used more force against him here than the IRS agent used there.

The defendants do not seriously contest that, if Deputy Yoder pulled or threw Mr. Zeen down to the ground the way Mr. Zeen maintains he did, it would constitute an unconstitutional use of excessive force. Nor could they. The law prohibiting such acts is clearly established (and therefore also forecloses a claim of qualified immunity). *Meredith*, 342 F.3d at 1061; *accord, e.g.*, *Winterrowd v. Nelson*, 480 F.3d 1181, 1184 (9th Cir. 2007) (affirming denial of summary-judgment and denial of qualified immunity in an excessive-force case because "[n]o reasonable officer could conclude that an individual suspected of a license plate violation posed a threat that would justify slamming him against the hood of a car"); *Sheehan v. Bay Area Rapid Transit*, No. 14-cv-03156-LB, 2016 WL 777784, at *12 (N.D. Cal. Feb. 29, 2016) (denying summary judgment and qualified immunity in an excessive-force case because even where a detainee is trying to twist free from an officer's grasp, "it should have been sufficiently clear to a reasonable official that he could not rightfully slam her to the floor") (internal quotation marks and brackets omitted) (citing *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994)). Instead, the defendants focus on a separate question, asking, if Deputy Yoder lost his balance and fell while holding Mr. Zeen and thereby caused Mr. Zeen to hit the ground as well, would that constitute an unconstitutional use of excessive force? That argument, however, assumes that it is undisputed that Deputy Yoder fell accidentally, as opposed to his intentionally pulling or throwing Mr. Zeen down to the ground. That fact is not undisputed. Mr. Zeen and Mr. LaRose both testified that Deputy Yoder either pulled or threw Mr. Zeen on the ground, and Mr. LaRose also contemporaneously described the incident seconds after it happened as Deputy Yoder "slam[ming] him that hard" and "two big guys throw[ing] down a hundred-pound kid." The defendants cite no authorities that suggest that Mr.

Zeen's and Mr. LaRose's statements and testimony are insufficient to raise a dispute of material fact as to whether the incident was an intentional use of force as opposed to an accident. *Cf. Winterrowd*, 480 F.3d at 1186 ("[w]hile the officers tell a different story, we must accept [plaintiff]'s version of the event" on a summary-judgment motion).[39]

The defendants also cite to the body-camera footage of the incident to argue that the facts are undisputed. Not so. As the defendants' own forensic expert attests, Deputy Yoder and Mr. Zeen were out of view of the body cameras when Mr. Zeen started to fall.[40] Deputy Yoder and Mr. Zeen reappear in the camera footage only after Mr. Zeen started falling.[41] The camera footage does not capture the cause of the fall and does not foreclose the possibility that Deputy Yoder intentionally pulled or threw Mr. Zeen to the ground (and possibly lost balance himself in the process). As the defendants' own expert attests, "[t]he video evidence is inconclusive as to the mechanism which triggered a loss of balance by either party."[42]

The material facts in this case are in dispute. Drawing all factual inferences in favor of Mr. Zeen as the non-moving party, the court cannot say as a matter of law that Deputy Yoder's actions were reasonable or that they did not violate clearly established law. The court denies summary judgment. *Cf. Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) ("'Because such [cases] nearly always require[] a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'") (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

---

[39] Mr. LaRose also said, "Dane, look at what you just did to yourself," but the defendants do not cite to any authorities that establish that this statement renders it undisputed that Deputy Yoder did not pull or throw Mr. Zeen to the ground, particularly given Mr. LaRose's statements immediately afterwards that Deputy Yoder "slam[med]" Mr. Zeen on the ground. And certainly the defendants have no authorities that support their argument that *Deputy Yoder's* statement that Mr. Zeen was the one who took him down renders the facts about what happened undisputed. *Contra* Defs. Reply – ECF No. 62 at 6 n.5.

[40] Schott Decl. – ECF No. 53 at 6 (¶ 7(B)) ("There are no clear video images of Zeen and Yoder during the 1.5 seconds prior to Yoder/Zeen's tandem fall.") (emphasis removed).

[41] *Id.*

[42] *Id.*

**2. County of Sonoma**

**2.1 Governing Law**

Liability against a government entity starts from the premise that there is no respondeat superior liability under Section 1983, i.e., no entity is liable simply because it employs a person who has violated a plaintiff's rights. *See, e.g., Monell*, 436 U.S. at 691; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Local governments can be sued directly under Section 1983 only if the public entity maintains a policy or custom that results in a violation of plaintiff's constitutional rights. *Monell*, 436 U.S. at 690–91. To impose *Monell* entity liability under Section 1983 for a violation of constitutional rights, a plaintiff must show that: (1) the plaintiff possessed a constitutional right and was deprived of that right, (2) the municipality had a policy, (3) the policy amounts to deliberate indifference to the plaintiff's constitutional rights, and (4) the policy was the moving force behind the constitutional violation. *See Plumeau v. Sch. Dist. # 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

The Ninth Circuit has explained how a policy may be proved:

> There are three ways to show a policy or custom of a municipality: (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (quoting *Ulrich v. City and Cty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)). The practice or custom must consist of more than "random acts or isolated events" and instead, must be the result of a "permanent and well-settled practice." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir. 1988), *overruled on other grounds by Bull v. City and Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Thus, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless" there is proof that the incident "was caused by an existing, unconstitutional municipal policy . . . ." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24 (1985).

## 2.2 Application

Mr. Zeen presents only two pieces of evidence in support of his claim against the County of Sonoma. The first is that between 2011 and 2015, there were 1666 reported use-of-force reports at the County Sheriff's Office, and that only two of these incidents resulted in a finding that a Sheriff's Office employee violated the use-of-force policy.[43] Mr. Zeen provides no explanation of these statistics, other than to intimate that the high ratio of reported incidents to incidents that resulted in a policy-violation finding necessarily implies some sort of constitutional indifference.[44] This is insufficient to withstand a summary-judgment motion. As numerous courts have held, "[s]tatistics of unsustained complaints of excessive force and other police misconduct, without any evidence that those complaints had merit, do[] not suffice to establish municipal liability under § 1983." *Bagley v. City of Sunnyvale*, No. 16-cv-02250-JSC, 2017 WL 3021030, at *2 (N.D. Cal. July 17, 2017) (quoting *Hocking v. City of Roseville*, No. Civ. S-06-0316 RRB EFB, 2008 WL 1808250, at *5 (E.D. Cal. Apr. 22, 2008)); *accord, e.g.*, *McArthur v. City and Cty. of San Francisco*, 190 F. Supp. 3d 895, 906 (N.D. Cal. 2016) ("In the context of a city's alleged indifference to its police officers violating the constitutional rights of its residents, providing evidence of past complaints is generally insufficient to establish a policy or custom of indifference.") (quoting *Haynes v. City and Cty. of San Francisco*, No. C 09-0174 PJH, 2010 WL 2991732, at *4 (N.D. Cal. July 28, 2010)).

---

[43] Pl. Opp'n – ECF No. 60 at 8–9 (citing Clark Decl. Ex. B – ECF No. 60-2 at 16–17). Mr. Zeen states that there were 1696 use-of-force reports, but the incident statistics he cites add up to 1666, not 1696.

Mr. Zeen further states that not one employee was disciplined for any use-of-force incident during this period, *id.* (citing Clark Decl. Ex. B – ECF No. 60-2 at 17), but that assertion is somewhat misleading. The interrogatory responses that Mr. Zeen cites construed the interrogatories as asking whether there were any employees who were disciplined and then continued to remain employed with the Sheriff's Office. The responses did not count employees who left the Sheriff's Office. Clark Decl. Ex. C – ECF No 60-2 at 22. At least one employee who was involved in a use-of-force incident was released from employment from the Sheriff's Office, and least one other employee who was involved in a use-of-force incident quit the Sheriff's Office because he was going to be terminated. Freitas Dep. pp. 78–82, 120–21 – ECF No. 60-1 at 85–86, 90.

[44] Pl. Opp'n – ECF No. 60 at 17–18.

Second, Mr. Zeen points to one prior use-of-force incident involving the Sonoma County Sheriff's Office and an individual named Esa Wroth.[45] Mr. Zeen argues that Sheriff Freitas determined that the force used on Mr. Wroth was within policy, which (Mr. Zeen claims) "raises a reasonable inference that virtually all uses of force, no matter how egregious, are 'within policy.'"[46] But Mr. Zeen does not offer evidence that satisfies any of the three ways — longstanding practice or custom, a decision by an official with final policymaking authority, or delegation to or ratification of a subordinate by such an official — for proving a County policy of deliberate indifference to constitutional rights. Mr. Zeen does not offer evidence of a longstanding practice or custom: he cites only a single incident, which is insufficient. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.") (citing cases).[47] Nor does Mr. Zeen offer evidence that an official with final policymaking authority either made a decision about the Wroth incident or delegated to, or ratified the decision of, a subordinate. The only evidence that Mr. Zeen cites is an interrogatory response from the Wroth litigation.[48] But contrary to Mr. Zeen's claim attributing this to Sheriff Freitas, the interrogatory response states that a Lieutenant Michael Toby made the determination that the Wroth incident was within County policies and procedures.[49] Mr. Zeen offers no evidence about who Lieutenant Toby is, whether he is "a final policymaking authority whose edicts or acts may fairly be said to represent

---

[45] *See generally Wroth v. County of Sonoma*, No. 3:14-cv-05519-SI (N.D. Cal. filed Dec. 18, 2014).

[46] Pl. Opp'n – ECF No. 60 at 18.

[47] "Liability based on custom is different from liability based on ratification or delegation where a single incident causally related to the constitutional deprivation may be sufficient for liability to attach." *Trevino*, 99 F.3d at 918 n.2 (citing cases).

[48] Pl. Opp'n – ECF No. 60 at 10 (citing Schwaiger Decl. Ex. 7 – ECF No. 60-1 at 61 (¶ 7)). Mr. Zeen also cites to the Wroth complaint, but it is black-letter law that a complaint is just an allegation and does not constitute evidence for the purposes of a summary-judgment motion.

[49] Schwaiger Decl. Ex. 7 – ECF No. 60-1 at 61 (¶ 8). Sheriff Freitas's name does not appear anywhere in the interrogatory responses.

1 official policy in the area of decision," or whether Sheriff Freitas delegated authority to Lieutenant
2 Toby or ratified his decision.

Additionally, even if Lieutenant Toby had sufficient policymaking authority to represent the County, the mere fact that the County determined that the Wroth incident was "within policy" is insufficient to establish that the County had a policy of deliberate indifference to constitutional rights. "Finding that an officer acted within policy does not alone amount to *Monell* ratification." *Weishaar v. County of Napa*, No. 14-cv-01352-LB, 2016 WL 7242122, at *14 (N.D. Cal. Dec. 15, 2016) (citing cases). "In other words, in order for there to be [*Monell*] ratification, there must be 'something more' than a single failure to discipline or the fact that the policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures." *Id.* (quoting *Garcia v. City of Imperial*, No. 08cv2357 BTM(PCL), 2010 WL 3911457, at *2 (S.D. Cal. Oct. 4, 2010)). "This 'something more' may be an 'obviously flawed investigation.'" *Id.* (citing *Garcia*, 2010 WL 3911457, at *2). "It may exist where the final decision-maker 'actively participated' in the challenged conduct." *Id.* (citing *Lytle v. Carl*, 382 F.3d 978, 986–88 (9th Cir. 2004)). "'Extreme factual situations' can also support ratification liability." *Id.* (citing *Garcia*, 2010 WL 3911457, at *2). "But generally, to hold a government entity 'liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle respondeat superior liability into section 1983,' thereby creating an 'end run around *Monell*.'" *Id.* (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992)). Here, Mr. Zeen has presented no evidence of extreme facts or special circumstances regarding the Wroth incident that could support a finding that the County had a policy of deliberate indifference to constitutional rights that caused Mr. Zeen's injuries. *Cf. id.* The court therefore grants summary judgment on the *Monell* claim.

### 3. Sheriff Freitas[50]

#### 3.1 Governing Law

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989)). "Supervisors can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000) (citing *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)). In other words, a supervisor can be held liable in his individual capacity "if he set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Larez*, 946 F.2d at 646 (citations and internal quotation marks and brackets omitted). A supervisor can be held liable only for his or her own personal conduct: "there is no respondeat superior liability under section 1983." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (citations omitted).

#### 3.2 Application

Mr. Zeen offers no evidence that Sheriff Freitas personally participated in any of the events on December 15, 2015. Nor does Mr. Zeen offer any evidence about Sheriff's Freitas's training, supervising, or controlling Deputies Yoder or Blount, that he acquiesced in their conduct, or that he showed a reckless or callous indifference to the rights of others. Mr. Zeen's statistical evidence is insufficient for his claims against Sheriff Freitas for the same reason it is insufficient for his

---

[50] Mr. Zeen is suing Sheriff Freitas solely in his individual capacity. Pl. Opp'n – ECF No. 60 at 14. Were he suing Sheriff Freitas in his official capacity, his claims would duplicate his claims against the County, and the court would dismiss them. *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cty. Sheriff's Dep't*, 533 F.3d 780, 799 (9th Cir. 2008).

claim against the County, and Mr. Zeen submits no other evidence that Sheriff Freitas personally participated in the conduct of which he complains.

## CONCLUSION

For the foregoing reasons, the court denies summary judgment as to Deputy Yoder and grants summary judgment as to Deputy Blount, Sheriff Freitas, and the County.

**IT IS SO ORDERED.**

Dated: May 31, 2018

_____
LAUREL BEELER
United States Magistrate Judge